# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-70007

United States Court of Appeals
Fifth Circuit

**FILED**

April 20, 2018

Lyle W. Cayce
Clerk

JEDIDIAH ISAAC MURPHY,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:10-CV-163

Before KING, DENNIS, and COSTA, Circuit Judges.

PER CURIAM:*

Jedidiah Isaac Murphy, a Texas death row inmate, seeks a certificate of appealability (COA) under 28 U.S.C. § 2253(c)(2) to appeal the denial of his petition for writ of habeas corpus. We GRANT a COA on two of Murphy's claims—that the State suppressed evidence by failing to disclose the existence of a pretrial conversation between a witness and the lead prosecutor and that

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-70007

trial counsel was constitutionally ineffective during the penalty phase of trial by failing to correct a potentially misleading impression created by one of his experts. We DENY Murphy's request on all his other claims.

## I.

Jedidiah Isaac Murphy forced 80-year-old Bertie Cunningham into the trunk of her own car, shot her in the head, drove her body to a creek, and dumped her there. Murphy was arrested two days later. He admitted to the shooting and led police to the location of Cunningham's body. Later at the police station, he wrote and signed a statement claiming that he accidentally shot Cunningham while forcing her into her own trunk.

The State of Texas tried Murphy for capital murder. During the guilt phase of Murphy's trial, Murphy's counsel objected to the introduction of Murphy's signed statement. Counsel argued it was given both involuntarily and in violation of *Miranda*. She also requested an instruction directing the jury to consider the voluntariness of the statement. Her request was granted.

To show Murphy's signed statement was lawfully obtained, the State called the detective who acquired it. According to the detective, when Murphy was arrested he was given the *Miranda* warning and brought to a magistrate for arraignment. After the arraignment, the detective drove Murphy to the creek where Cunningham's body was located. The detective asked Murphy to get out of the car and show him where Murphy threw his gun, but Murphy refused. Murphy was taken back to the police station. There, he wrote and signed a statement admitting to the shooting but claiming it was an accident. For the first seven days after his arrest, Murphy voluntarily spoke to the police when interrogated. But on the eighth day, after being given the *Miranda* warning, Murphy told the detective he no longer wished to speak to the police. His request was honored. Based on this testimony, the trial court admitted Murphy's signed statement.

2

No. 17-70007

The detective also testified that he drove Murphy around, looking for the spot where Murphy abducted and killed Cunningham. Murphy was not able to identify the spot. During cross-examination, defense counsel elicited that Murphy was both cooperative and truthful when he tried but failed to identify where the abduction occurred. On redirect, the State elicited that the detective's opinion of Murphy's truthfulness eroded over time. According to the detective, Murphy did not answer "quite a few" questions and parts of his statement turned out to be false.

The jury was instructed on capital murder, murder, and manslaughter. During summation, Murphy's counsel argued that if Murphy's gun went off accidentally, he did not intend to kill Cunningham, and thus he could not be convicted of capital murder. The prosecution told the jury that capital murder "is the first offense you are to consider. Only if you do not believe the State has proven it beyond a reasonable doubt do you go to one of the lesser included offenses." This drew no objection from Murphy's counsel. The jury convicted Murphy of capital murder.

The State sought the death penalty. During this phase of the trial, the sides clashed over the future threat to society Murphy would pose if allowed to live. In particular, the severity of Murphy's history of violence was a point of contention.

To demonstrate such a history, the State introduced evidence implicating Murphy in a three-year-old kidnapping. Sheryl Wilhelm testified that Murphy had kidnapped her three years before the Cunningham killing. After seeing a TV news report on Cunningham's murder which featured Murphy's photo, Wilhelm called the police to report Murphy as her potential kidnapper. She identified Murphy as her kidnapper in a photo lineup and then again at trial. The detective who conducted the photo lineup, John Stanton,

testified that Wilhelm's "was one of the better photo I.D.'s" he ever had and that she said "she was virtually sure that that was the guy who abducted her."

Murphy called a psychologist to attack Wilhelm's identification. The psychologist testified that Wilhelm's memory was potentially influenced by the photo of Murphy she saw on the news. He also pointed out prominent differences between a composite sketch, made just a week after the kidnapping, and the press photo releases of Murphy. Finally, the psychologist testified that the photo lineup was unfairly constructed—obvious differences between the mugshots reduced the odds of selection from one-in-six to one-in-three.

Defense counsel also raised an alibi defense to Wilhelm's kidnapping. Wilhelm said she had been kidnapped, escaped, and had her car stolen at 11:30 a.m. in Arlington, Texas. The day after her kidnapping, Wilhelm's car was found in Wichita Falls, Texas. In the car, the police found documents belonging to another woman. That woman had been assaulted and had her purse stolen at 8:24 p.m. on the day of Wilhelm's kidnapping outside a Braum's restaurant in Wichita Falls. Also on the same day, Murphy clocked in for his night shift at 11:54 p.m. in Terrell, Texas. Murphy's counsel argued to the jury that Murphy did not have time to kidnap Wilhelm in Arlington, rob the other woman in Wichita Falls, and make it to work in Terrell.

The trial did not just focus on whether Murphy was a future threat to society. Murphy argued that mitigating circumstances reduced his moral blameworthiness. To buttress this case, Murphy called two psychologists: Dr. Mary Connell and Dr. Jaye Crowder.

Dr. Connell testified that she administered two tests on Murphy: the MMPI-II and the MCMI-III. The MMPI-II develops a mental and emotional profile of the test taker by comparing his or her answers to 567 true-false questions with other people in clinical settings. Murphy's MMPI-II results

4

showed, per Dr. Connell, that Murphy exhibited depression, anxiety, physical ailments, and paranoid thoughts. The MCMI-III consists of 175 questions related to the test taker's character. Murphy's MCMI-III results suggested, again per Dr. Connell, that Murphy suffered from extreme emotional distress and very disturbed function. Murphy's results on both tests would normally prompt referral for psychiatric consultation and probably indicate a need for medication. Importantly, no psychologist besides Dr. Connell was directly involved in administering or interpreting Murphy's MMPI-II and MCMI-III. The tests only draw on algorithms constructed by other psychologists to render hypotheses about the subject's mental state and character. Further, neither test returns a final interpretation. Rather, as both reports—which were introduced into evidence—and Dr. Connell explained, the MMPI-II and MCMI-III offer only hypotheses.

When cross-examined, Dr. Connell agreed that Dr. James Butcher, "probably the leading expert in the country on the interpretation of the MMPI," had interpreted Murphy's MMPI-II. In reality, Dr. Butcher had developed the test, but a computer algorithm was tasked with interpreting Murphy's answers. This did not stop Dr. Connell from appearing to agree that Dr. Butcher himself concluded that Murphy "has serious problems controlling his impulses and temper," is "assaultive," "loses control easily," is manipulative, matches the profile of a Megargee Type H offender, and is a poor candidate for psychotherapy. The prosecution also referred to the MCMI-III as a "report produced by Dr. [Theodore] Millon in this case," without correction. Dr. Millon developed the MCMI-III, and Dr. Connell affirmed the prosecution's characterization of him as authoritative. The prosecution elicited from Dr. Connell that through the MCMI-III, Dr. Millon himself had concluded that Murphy "may have reported more psychological symptoms than objectively exist," and Murphy has "a moderate tendency toward self-deprecation and a

consequent exaggeration of current emotional problems." On redirect, Dr. Connell did not clarify that neither Dr. Butcher nor Dr. Millon personally administered or evaluated Murphy's tests.

Murphy's trial counsel also called another psychologist to provide mitigation testimony. Dr. Crowder, a psychologist and university faculty member, diagnosed Murphy with major depression and dysthymic disorder. He testified that Murphy was alcohol dependent, a narcissist, and had a borderline personality disorder. He explained what these disorders are and what effects they had on Murphy's behavior. Dr. Crowder further explained the effects of Murphy's childhood abandonment on his neurological development and ability to make decisions. He said there was hope for Murphy through treatment in a controlled environment.

During cross-examination, Dr. Crowder acknowledged that were Murphy outside prison, he would be "concerned." The prosecution also recited the gruesome facts of four death penalty cases where Dr. Crowder had testified that the defendant would not be a future threat to society. And Dr. Crowder admitted that he would not have predicted that any member of a group called the "Texas Seven," who broke out of prison and murdered a police officer, would have presented a danger in prison. But, Dr. Crowder stated that "the odds are against [Murphy's] future dangerousness in prison." Moreover, Dr. Crowder commented on the statistically low odds of escape for all prisoners and that Murphy presented a low escape risk. On redirect, Dr. Crowder noted that Murphy would not be parole eligible for a minimum of 40 years.

During summation, the prosecution emphasized the "chilling" results of Murphy's MMPI-II and MCMI-III. Specifically, the prosecution argued that Murphy's profile matched that of a Megargee Type H offender—"one of the most seriously disturbed inmate types," and for whom "[a]djustment to prison appears to be difficult." According to the prosecution, Dr. Butcher—the

developer of the MMPI-II—had personally interpreted Murphy's results. Per the prosecution, Dr. Butcher thought Murphy was "a poor candidate for psychotherapy" and that "[i]ndividuals with his profile are not very amenable to changing their behavior." The prosecution further noted that Dr. Butcher was "hired by the defense to look at the tests administered," and was "not some expert that we hired." Murphy's counsel did not object to this line of argument or counter it during her concluding remarks.

The jury found that Murphy was a continuing threat to society and there were insufficient mitigating circumstances to warrant life in prison. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2. Based on these findings, Murphy was sentenced to death.

Murphy's conviction and sentence were affirmed on direct appeal. *Murphy v. State*, 112 S.W.3d 592, 595 (Tex. Crim. App. 2003). Likewise, his first state habeas application was denied. *Ex parte Murphy*, No. WR–70,832–01, 2009 WL 766213, at *1 (Tex. Crim. App. Mar. 25, 2009) (per curiam) (not designated for publication).

In 2009, Murphy's new lawyer cold called Wilhelm and Stanton and asked them what happened during the photo lineup. Wilhelm said that when she identified Murphy, she stated to Stanton: "This is him. This looks a lot like him, and I'm pretty sure it's him." She also stated that: "You know, nobody's ever 100 percent sure . . . . I'm talking about anything in this life but, I mean, to me, it was him. I mean, 95 to 100 percent it was him." Wilhelm said that the lead prosecutor in Murphy's case came to her house before trial and, in Murphy's lawyer's words, "told [her] that [she] got the right guy."

During the call with Stanton, Stanton agreed that Wilhelm's statement—that she was "pretty sure"—comported with his recollection of what she said during the photo lineup. Murphy's new lawyer also asked Stanton twice whether Wilhelm's identification was tentative. The first time,

Stanton responded that Wilhelm "was pretty strong to the photo of [Murphy]." The second time, Stanton agreed that it was "a strong tentative ID complicated by the fact that she could have been identifying the guy she saw on TV as opposed to the guy who robbed her." Stanton then discussed why he did not pursue charges against Murphy for the kidnapping. Stanton said he did not think it would "fly through a DA's office." Stanton thought "hell, I could defend the guy off of that one. . . . And I'm not even a lawyer."

Murphy filed a federal habeas petition. The district court stayed the proceedings to give Murphy time to exhaust three sets of claims in the state system: (1) suppression of evidence and use of false testimony by the prosecution, (2) ineffective assistance of trial counsel at the guilt phase, and (3) ineffective assistance of trial counsel at the penalty phase.

Following the stay, Murphy filed a second state habeas application. The Texas Court of Criminal Appeals (TCCA) dismissed as abuses of the writ Murphy's two sets of ineffective assistance claims. *Ex parte Murphy*, No. WR–70,832–02, 2010 WL 3905152, at *1 (Tex. Crim. App. Oct. 6, 2010) (per curiam) (not designated for publication). With respect to Murphy's suppression and false testimony claims, the TCCA remanded with instructions to determine whether the claim was procedurally barred and, if not, whether it had merit. *Id.*

The state trial court held an evidentiary hearing where it heard testimony from Wilhelm, Stanton, the lead prosecutor, and Murphy's lead trial counsel. The court found that Murphy's suppression and false testimony claims should be dismissed as procedurally barred and alternatively denied as meritless. Based on the trial court's findings, the TCCA concluded that Murphy's application was an abuse of the writ and dismissed his application. *Ex parte Murphy*, No. WR-70,832-02, 2012 WL 982945, at *1 (Tex. Crim. App. Mar. 21, 2012) (per curiam) (not designated for publication).

No. 17-70007

Murphy returned to federal court and raised the three sets of now exhausted claims, among others. The district court denied Murphy relief on all of his claims. It also denied his request for an evidentiary hearing.

As the district court denied Murphy's request for a COA, he now seeks one from this court.

## II.

We may issue a COA only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further'"—i.e., whether the applicant's claim is "debatable." *Buck v. Davis*, 137 S. Ct. 759, 773–74 (2017) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 327, 348 (2003)).

Here, Murphy seeks a COA on three sets of claims:

(1) Suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and introduction of false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959),[1] based on:

    a. Wilhelm's statement that she was only "pretty sure" Murphy was her kidnapper;

    b. Wilhelm's opinion that she was only 95 percent sure;

    c. Stanton's opinion that the identification was a strong tentative;

    d. Stanton's opinion that he did not pursue kidnapping charges against Murphy because Wilhelm's identification could have been tainted by seeing Murphy on TV;

---

[1] Murphy labels his claims as violations of *Giglio v. United States*, 405 U.S. 150 (1972), rather than *Napue*. But *Napue* is a better fit for Murphy's claims, as here he is alleging the use of false testimony, not merely the failure to disclose contradictory evidence.

   e.  The pretrial conversation where the lead prosecutor confirmed to Wilhelm that she got the right guy;

(2) Ineffective assistance of trial counsel at the guilt phase (IATC-guilt), arising from his counsel's:

   a.  Failure to object to the introduction of his post-arrest silence;

   b.  Opening of the door to police opinion testimony;

   c.  Failure to object to a prosecutor's statement during summation;

(3) Ineffective assistance of trial counsel at the penalty phase (IATC-penalty), arising from his counsel's:

   a.  Failure to submit evidence showing the timeline of the Wilhelm kidnapping was logistically impossible;

   b.  Failure to correct a false impression created by Dr. Connell; and

   c.  Decision to call Dr. Crowder.

We grant a COA on claims (1)(e) and (3)(b). We deny COAs on all others.

## III.

As just stated, Murphy presented the district court with five *Brady* or *Napue* claims. The district court denied these claims, finding them procedurally barred and alternatively meritless. For the first four claims, this denial is not debatable by reasonable jurists, and therefore we deny Murphy's request for a COA on those claims. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000) (holding that when the district court dismisses on procedural grounds, a COA should issue only if the merits of the claim and the procedural ruling are debatable by reasonable jurists). For the last one, the denial was debatable and thus a COA should issue.

Murphy's first state habeas application did not raise his present claims. When they were raised in his second application, the TCCA dismissed them based on abuse of the writ. *Murphy*, 2012 WL 982945, at *1. Texas's abuse of the writ doctrine is an independent state ground that ordinarily will foreclose

federal review. *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008). Murphy attempts to overcome this procedural bar by relying on *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). Under *Martinez* and *Trevino*, the ineffectiveness of state habeas counsel may excuse a petitioner's procedural default "of a single claim"—ineffective assistance of trial counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). No court appears to have extended *Martinez* and *Trevino* to excuse procedural default of a *Brady* or *Napue* claim. We are also bound by our past pronouncements that *Martinez* and *Trevino* apply "only" to ineffective assistance of trial counsel claims. *See, e.g.*, *Speer v. Stephens*, 781 F.3d 784, 785 (5th Cir. 2015). And the Supreme Court in *Davila* was unwilling to extend *Martinez* and *Trevino* beyond ineffective assistance of trial counsel claims, calling the exception "narrow," "highly circumscribed," and available only in "limited circumstances." 137 S. Ct. at 2065–66. We therefore do not find it debatable whether Murphy can excuse default of his *Brady* and *Napue* claims through *Martinez* and *Trevino*.

Murphy also tries to excuse his procedural default using *Banks v. Dretke*, 540 U.S. 668 (2004). "A federal court may consider the merits of a procedurally defaulted claim if the petitioner shows 'cause for the default and prejudice from a violation of federal law.'" *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 10). Under *Banks*, a petitioner shows "cause" if "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence"—that is, the evidence was suppressed within the meaning of *Brady*. 540 U.S. at 691.[2] To establish this, Murphy has to show that he could not discover the favorable evidence through the exercise of "reasonable diligence." *See Kutzner v. Cockrell*, 303

---

[2] Neither party argues that the analysis is different for Murphy's *Napue* claims. We therefore perform the same analysis to dispatch both types of claims.

F.3d 333, 336 (5th Cir. 2002); *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). To show prejudice, Murphy must demonstrate that "the suppressed evidence is 'material' for *Brady* purposes." *See Rocha v. Thaler*, 619 F.3d 387, 394 (5th Cir. 2010). Murphy fails, even debatably, to make either showing for the first four claims.

The state trial court found that by exercising reasonable diligence, Murphy could have ascertained the basis for his claims in time to raise them in his original state habeas application.

The state court found that the facts underlying Murphy's first four claims—Wilhelm's and Stanton's alleged statements and opinions—could be revealed via cross-examination at the pretrial hearing or trial itself. This finding is entitled to deference under 28 U.S.C. § 2254(e)(1). *See Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008).[3] Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and that this "presumption of correctness" may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Murphy cannot even debatably overcome this presumption for the first four claims as he presents no evidence rebutting the state court's finding. He does

---

[3] Murphy's argument against applying § 2254(e)(1) does not relate to the state trial court's findings on procedural default. Rather, he argues only that § 2254(e)(1)'s presumption of correctness does not attach to the trial court's findings on the merits because the TCCA dismissed Murphy's second application as an abuse of the writ without considering the merits. But even this argument is off the mark. "A trial court's factual findings are entitled to a presumption of correctness even if the state appellate court reached a different legal conclusion when applying the law to those facts." *Williams*, 551 F.3d at 358. Only when the trial court's factual findings "were directly inconsistent with the appellate court's decision" will they be denied a presumption of correctness. *Id.* (citing *Micheaux v. Collins*, 944 F.2d 231, 232 (5th Cir. 1991) (en banc)). Here, the state trial court's findings on the merits were not directly inconsistent with the TCCA's dismissal based on abuse of the writ. Thus, all of the state trial court's findings are entitled to a presumption of correctness under § 2254(e)(1). Because we conclude that it is debatable by reasonable jurists whether Murphy's *Brady* and *Napue* claims were "adjudicated on the merits" by the state courts, we do not apply 28 U.S.C. § 2254(d)'s deferential standard of review at this stage.

have some evidence indicating Stanton and Wilhelm would not speak to the defense team after, not during, trial. But none of this evidence indicates that Stanton would have lied under oath about his opinion of Wilhelm's identification and his reason for not pursuing kidnapping charges against Murphy. And the evidence Murphy cites to show that Wilhelm would have lied only indicates that Wilhelm would have testified that she was 100 percent certain Murphy kidnapped her. This does not show that Wilhelm would not disclose what she said during the photo lineup.

Nor can Murphy debatably show prejudice for any of these four claims. The state court found that every piece of allegedly suppressed evidence either did not exist, was not possessed by the State, or was immaterial. On Murphy's first claim, the court found that Wilhelm's "pretty sure" comment both did not accurately reflect what she said at the photo lineup and, either way, was substantially similar to what she said at trial. *See Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996) (holding that evidence is immaterial if it duplicates evidence at trial). On the second claim, the court found that Wilhelm's opinion that she was 95 percent sure was both substantially similar to her statements at trial and was not possessed by the State. *Cf. Avila v. Quarterman*, 560 F.3d 299, 309 (5th Cir. 2009) (holding that the undisclosed opinion of an expert witness is not imputed to the state unless the witness is part of the prosecution team); *United States v. Pelullo*, 399 F.3d 197, 211–12 (3d Cir. 2005) (holding that no "cause" exists under *Banks* if the prosecution is unaware of the evidence). Turning to the third claim, the court found that Stanton's opinion that Wilhelm's identification was a strong tentative was similar to what Stanton said at trial and therefore was immaterial. *See Westley*, 83 F.3d at 725. On the fourth claim, the court found, based on Stanton's testimony at the evidentiary hearing, that the real reason Stanton did not pursue the kidnapping charges against Murphy was because Murphy was already facing

capital murder charges, not because he thought Wilhelm's identification was weak. *See United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989) (holding that *Brady* does not apply to neutral evidence). All these findings are presumed correct unless rebutted by clear and convincing evidence. Murphy cannot even debatably overcome this hurdle.

Murphy's fifth claim based on Wilhelm's pretrial conversation with the prosecutor presents a different situation. It is debatable whether Murphy had a reasonable opportunity to discover the conversation pretrial or at trial. And it is debatable whether Murphy had an obligation after trial to discover the conversation given the State's possible suppression of it. *See Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) ("In finding procedural default, the district court relied upon the fact that [the relevant *Brady* material] was available in the public record. However, if the State failed under a duty to disclose the evidence, then its location in the public record, in another defendant's file, is immaterial." (citing *Banks*, 540 U.S. at 690–93)). Finally, it is debatable whether the conversation was impeachment evidence sufficient to establish materiality under *Brady*. As we are granting a COA on this claim, we will not linger on it. To be brief, we are not convinced that the district court's merits and procedural grounds for denying this claim are beyond debate. *See Slack*, 529 U.S. at 484–85.

In sum, reasonable jurists could not debate that the district court properly dismissed Murphy's first four *Brady* and *Napue* claims on the basis that they were procedurally barred and meritless. The same cannot be said for Murphy's last claim, and accordingly we grant a COA on it. We next turn to Murphy's two sets of ineffective assistance of trial counsel claims.

**IV.**

Murphy argues that his trial counsel was constitutionally ineffective at both the guilt and penalty phases. His claims are governed by the well-known

*Strickland* standard. Murphy must show: (1) that his trial counsel rendered deficient performance, and (2) that the deficient performance resulted in actual prejudice. *See, e.g.*, *Rhoades v. Davis*, 852 F.3d 422, 431 (5th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The first prong of *Strickland* "sets a high bar." *Buck*, 137 S. Ct. at 775. "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades*, 852 F.3d at 431–32 (quoting *Strickland*, 466 U.S. at 687–88).

To satisfy *Strickland*'s second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Mildly complicating things, Murphy's IATC claims were procedurally defaulted. Thus, to acquire a COA, he must show not only that his underlying IATC claims are debatable, but also that he debatably has excuse for default under *Martinez* and *Trevino*. *See Slack*, 529 U.S. at 484–85.

Ordinarily, a state prisoner bringing a federal habeas petition is foreclosed from presenting a claim dismissed as an abuse of the writ by the TCCA. *See Moore*, 534 F.3d at 463. Nevertheless, this procedural bar may be overcome by "showing cause for the default and prejudice." *Martinez*, 566 U.S. at 10. Under *Martinez* and *Trevino*, Murphy may show cause and prejudice by showing: "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).

No. 17-70007

The parties' dispute here centers on *Martinez*'s first requirement: whether Murphy's underlying IATC claims are substantial.[4] Conveniently, the test for whether the underlying claim is substantial is the same as the one for granting a COA—i.e., the claim is debatable by reasonable jurists. *See Trevino v. Davis*, 861 F.3d 545, 548–49 (5th Cir. 2017). All this is to say that Murphy may acquire a COA on his claims if he shows that his underlying IATC claims are debatable.

No state court has adjudicated Murphy's IATC claims on the merits. Nor has a state court make relevant factual findings on them. Thus, the strictures of 28 U.S.C. § 2254(d) and (e)(1) do not apply, and we review de novo. With this in mind, we turn first to Murphy's IATC-guilt claims.

**A.**

Murphy isolates three acts or omissions that he contends establish independent IATC-guilt claims: (1) his counsel did not object to the introduction of his post-arrest silence; (2) his counsel opened the door to police opinion testimony on Murphy's lack of truthfulness and cooperation; and (3) his counsel did not object to the prosecutor's comment on the sequencing of jury deliberations. None of these gives rise to an IATC claim reasonable jurists could debate.

**1.**

Murphy contends that his counsel twice failed to object when the prosecution's questioning turned to Murphy's post-arrest silence. First, the

---

[4] The district court held, and the State urges us to hold, that Murphy cannot establish *Martinez*'s second requirement—that his original state habeas counsel was ineffective. For the district court, the lack of merit to Murphy's underlying IATC claims meant that his habeas counsel could not have been ineffective in failing to raise them.

We do not need to decide this issue for the five IATC claims that do not satisfy *Martinez*'s first requirement. But, for the IATC claim we find debatable by reasonable jurists, we conclude that state habeas counsel was at least debatably ineffective in failing to raise it. *See King v. Davis*, 703 F. App'x 320, 328 n.9 (5th Cir. 2017) (per curiam).

prosecution elicited testimony from the detective who interrogated Murphy that Murphy refused to show upon request the police where he threw his gun. Second, the prosecution elicited testimony that Murphy eventually invoked his right to silence after receiving the *Miranda* warning. According to Murphy, these questions about his post-arrest silence should have drawn meritorious objections.[5] Counsel's failure to object prejudiced Murphy, as his post-arrest silence made it seem like he was not cooperating or being wholly truthful with the police. This threw shade on his theory that his gun fired accidentally because this theory depended heavily on his credibility. According to Murphy, this was the difference between life and death. If Murphy could show the shooting was an accident, he could only be convicted of murder or manslaughter, not capital murder.

Murphy's argument does not debatably satisfy either of *Strickland*'s prongs for a simple reason—an objection would have been frivolous. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). The Due Process Clause of the Fourteenth Amendment protects a defendant's silence after receiving the *Miranda* warning. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). While the *Miranda* warning "contain[s] no express assurance that silence will carry no penalty, such assurance is implicit." *Id.* at 618. It would therefore be "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* But a "prosecutor's reference to a defendant's post-*Miranda* silence may properly be made where it is not 'used to impeach' the defendant's

---

[5] Murphy argues that this line of questioning is prohibited under both the federal Constitution and Texas evidentiary law. However, he does not argue that there are any material differences between federal and Texas law. Accordingly, given the absence of argument, we will not search for any differences, if any exist, and our disposition of his federal-law argument dispenses with his state-law argument.

'exculpatory story', or as substantive evidence of guilt, but rather to respond to some contention of the defendant concerning his post-arrest behavior." *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) (emphasis removed) (citing *Doyle*, 426 U.S. at 632 n.11).

In this case, no meritorious objection existed because the State did not elicit the detective's testimony to impeach Murphy or show his guilt. Instead, it elicited and used the testimony to show that Murphy's signed statement was voluntary—a contested issue throughout trial that was eventually submitted to the jury. Both of the detective's answers demonstrated the voluntariness of Murphy's statement—they showed that Murphy knew he could stop the questioning and that the police would honor his request. *See Michigan v. Mosley*, 423 U.S. 96, 101–04 (1975) (citing the "right to cut off questioning" as a "critical safeguard" against coercion). Murphy's counsel had "opened the door" to these questions by putting his voluntariness at issue, and absent some evidence that the prosecution used Murphy's silence for a prohibited purpose, Murphy's counsel lacked a valid objection. *See Martinez-Larraga*, 517 F.3d at 268 (quoting *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975)).[6]

**2.**

Next, Murphy contends that his trial counsel blundered when she opened the door to the detective's opinion on Murphy's truthfulness and cooperation. Ordinarily, under Texas law, a police witness may not directly testify as to his opinion on the defendant's truthfulness. *See Schutz v. State*,

---

[6] Murphy's argument that an evidentiary hearing might allow him to show his counsel performed deficiently has no merit. Whether counsel's failure to object was a result of carelessness or careful consideration, the fact remains that there was no objection to be had. This is a clear circumstance where we can assume "the truth of all the facts" the petitioner seeks "to prove at the evidentiary hearing" and remain confident that "he still could not be granted federal habeas relief." *See Schriro v. Landrigan*, 550 U.S. 465, 481 (2007). In such circumstances, reasonable jurists could not debate whether the district court abused its discretion by denying an evidentiary hearing. *See id.*

957 S.W.2d 52, 59 (Tex. Crim. App. 1997). Here though, Murphy's counsel asked the detective whether he thought Murphy was truthful and cooperative when helping the police find where he abducted and killed Cunningham. This opened the door for the prosecution. *See id.* at 71 ("[I]nadmissible evidence may be admitted if the party against whom the evidence is offered 'opens the door.'"). The prosecution stepped through it, eliciting that the detective thought Murphy was not being truthful because Murphy did not answer "quite a few" questions and parts of his statement were false. Per Murphy, this attack on his truthfulness and cooperation decimated his best defense. He needed to be credible in the jury's eyes for it to accept his story that his gun fired accidentally.

Murphy does not debatably satisfy either prong of *Strickland*. Judged on the record before us, counsel's decision to ask the detective whether Murphy was being truthful and cooperative was objectively reasonable. A little context makes this clear. A point of contention between the parties at trial was whether venue was proper. This turned on the location of Cunningham's abduction and murder. On direct, the detective said that Murphy said he wished to cooperate with the police efforts to ascertain this location—"he didn't want to hide anything." The detective drove Murphy around, trying to locate the spot, but Murphy never identified it. The detective and Murphy returned to the police station, where Murphy then wrote the statement that he shot Cunningham accidentally. The prosecution elicited from the detective that there were several inaccuracies in the signed statement. On cross-examination, the detective admitted that Murphy was trying to be helpful and cooperate with the detective's attempt to find the location of abduction. Despite his cooperation, the spot was never pinpointed. On redirect, the prosecution countered by eliciting testimony that the detective's opinion of Murphy's

truthfulness eroded over time. According to the detective, Murphy did not answer "quite a few" questions and parts of his statement were false.

From the record, it is clear that defense counsel elicited that Murphy was being cooperative to support her venue argument. It was her follow-up question to the detective's admission that they could not pinpoint the abduction site. The detective's testimony—that Murphy and he drove all around the relevant county and Murphy earnestly tried and failed to identify the spot—supports the theory that the abduction occurred outside the relevant venue. Moreover, given that Murphy's credibility was already under attack, eliciting testimony that he was cooperative was reasonable. This is especially the case because there was not much else for counsel to go on. Granting that Murphy needed to be credible for his accidental shooting theory to fly, there does not appear to be any other evidence to bolster Murphy. Thus, counsel made an objectively reasonable decision given the poor options before her.

Murphy's counter is straightforward—he wants a chance to show that his counsel's question was not an informed tactical decision. To do so, he seeks an evidentiary hearing. That would allow him to ask his trial counsel—who his present lawyer submits will not cooperate willingly—whether she pondered the fact that her question would open the door to unfavorable opinion testimony. He never got a chance to develop such testimony before the state courts because original state habeas counsel never brought an IATC claim. And the federal district court deprived him of a chance by denying his request for an evidentiary hearing. He submits that this denial was debatably an abuse of discretion. *See Schriro v. Landrigan*, 550 U.S. 465, 468 (2007) (holding that denials of evidentiary hearings are reviewed for abuse of discretion).

Contra Murphy, we conclude that reasonable jurists could not debate whether the district court abused its discretion by denying an evidentiary

hearing on this claim.[7] No abuse of discretion occurs if "there is not 'a factual dispute which, if resolved in [the prisoner's] favor, would entitle him to relief.'" *Norman v. Stephens*, 817 F.3d 226, 235 (5th Cir. 2016) (alteration in original) (quoting *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000)). An evidentiary hearing is not required "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *See Schriro*, 550 U.S. at 474.

Murphy is correct to note that the strong presumption of competence attaches only after "thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. But in this case, even if we presume counsel's decision was unconsidered and thus dispense with the presumption of competence, Murphy would lack even a debatable *Strickland* claim. The relevant inquiry is whether "counsel's representation fell below an *objective* standard of reasonableness." *Strickland*, 466 U.S. at 688 (emphasis added). *Strickland* "calls for an inquiry into the objective reasonableness of counsel's *performance*, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (emphasis added). Accordingly, we need not "insist counsel confirm every aspect of the strategic basis for his or her actions." *Id.* at 109. Thus, our determination that counsel's performance was objectively reasonable means there is no need to inquire into counsel's state of mind.

And even if trial counsel admitted that she did not contemplate the full import of her decision, "there is no expectation that competent counsel will be a flawless strategist or tactician." *Id.* at 110. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). While isolated errors "can support an ineffective-assistance claim if it is 'sufficiently egregious

---

[7] The State also argues that such record development is barred by 28 U.S.C. § 2254(e)(2). We conclude that reasonable jurists could debate this point. Therefore, at this stage we do not consider (e)(2)'s bar on record development.

and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111 (citation omitted) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Here, counsel attempted to get Murphy's case dismissed for lack of venue. She strenuously tried to keep out Murphy's signed statement. When it came in, she argued to the jury that it was involuntarily given. And she supported Murphy's accidental shooting theory by cross-examining State witnesses about unintended discharge and calling expert witnesses to support the theory. In light of what counsel was given to work with and the record evidence indicating overall competent performance at the guilt phase, the district court did not debatably abuse its discretion in finding the record "precludes habeas relief." *See Schriro*, 550 U.S. at 474.

More importantly, Murphy's hypothetical evidence of his counsel's incompetence would have no bearing on whether he was prejudiced. Under *Strickland*'s prejudice prong, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). Rather, the alleged errors "must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Here, the evidence supporting Murphy's accidental shooting theory was weak and the State's evidence refuting it was strong. Soon after the shooting, Murphy attempted to withdraw money from Cunningham's bank account with her ATM card. When that failed, he spent the next two days using Cunningham's credit cards to buy food, beer, and other frivolities for himself and others. He drove his niece and her two teenage friends around in Cunningham's car with Cunningham's body still in the trunk. Murphy shot Cunningham in the head, and some forensic evidence indicated that the gun was fired right next to her. And more than the detective's opinion impeached Murphy's truthfulness. Factual inaccuracies in

the signed statement were introduced before Murphy's counsel asked the allegedly incompetent question. As Murphy now admits, the only real evidence to support his theory was his self-serving statement, which was revealed only after his arrest. Given all this, it is undebatable that removing both the beneficial and detrimental opinion testimony on Murphy's cooperation and truthfulness would not create a "reasonable probability" of acquittal on capital murder. *See Strickland*, 466 U.S. at 694.

**3.**

Murphy's final IATC-guilt claim concerns unobjected-to comments by the prosecution about the jury's deliberative process. As background, under Texas law, juries are left to their own devices when deciding the order in which they will consider the charges against the defendant. *See Barrios v. State*, 283 S.W.3d 348, 352 (Tex. Crim. App. 2009). This means that a jury need not acquit a defendant—i.e., unanimously agree that reasonable doubt exists—on a greater offense before considering a lesser one. *See id.* at 352–53. That said, jury instructions which imply that acquittal on a greater offense must precede consideration of lesser included offenses are considered "inartful" and not best practice, but have not been held to be erroneous. *See id.* at 353. In *Barrios*, the charge at issue was upheld. *Id.* There, the jury was instructed on capital murder, and then instructed that "[u]nless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and next consider whether the defendant is guilty of robbery." *Id.* at 349.

In this case, the jury was instructed on capital murder, murder, and manslaughter. Similarly to the instructions in *Barrios*, the instructions here provided the jury with the elements of capital murder and then instructed that "[i]f you do not so believe, or if you have a reasonable doubt thereof, you will next consider whether the defendant is guilty of" the two lesser offenses. In

accord with these instructions, the prosecution told the jury during summation that capital murder "is the first offense you are to consider. Only if you do not believe the State has proven it beyond a reasonable doubt do you go to one of the lesser included offenses."

Murphy argues that the prosecutor's comment was an erroneous description of Texas law. It misled the jury, implying that they had to acquit on capital murder before considering the lesser offenses. According to Murphy, counsel's failure to object was debatably unreasonable and prejudicial as it is possible the jury never considered the lesser offenses.

We cannot agree. Murphy has not argued that the jury instruction itself was erroneous, and we can discern no viable objection to the prosecution's near repetition of a rightly given instruction. The cases Murphy cites are distinguishable on this basis. Two of them involve a prosecutor who made comments which were contrary to the charge. *See Ex parte Drinkert*, 821 S.W.2d 953, 955 (Tex. Crim. App. 1991) (finding counsel's performance deficient based on failure to object to a prosecutor's statement that "was not only contrary to the court's charge," but also "a misstatement of the applicable law"); *Davis v. State*, 506 S.W.2d 909, 911 (Tex. Crim. App. 1974) (reversing a conviction based on prosecutorial statements which were "contrary to the court's charge"). The third involves an incorrect statement on a point of law left completely unaddressed by the instructions. *See Andrews v. State*, 159 S.W.3d 98, 100 (Tex. Crim. App. 2005).

Further, reasonable jurists could not debate whether prejudice exists. Put simply, while it is "conceivable" that the prosecutor's functional restatement of the instructions influenced the jury deliberations in a manner the instructions taken alone would not, such a sequence of events lacks any "reasonable probability." *See Strickland*, 466 U.S. at 693–94.

We next consider Murphy's IATC-penalty claims.

No. 17-70007

## B.

Murphy isolates three errors by his counsel during his trial's penalty phase: (1) she failed to introduce evidence showing the Wilhelm kidnapping timeline was logistically impossible; (2) she failed to correct a false impression created by Dr. Connell; and (3) she unwisely called Dr. Crowder. The second claim is debatable by reasonable jurists, and we therefore grant a COA on it. The other two are not.

## 1.

Murphy argues that his counsel should have introduced more evidence to support his alibi for the Wilhelm kidnapping. Specifically, more should have been offered to show that the kidnapping timeline did not add up. Recall that the day Wilhelm was kidnapped and escaped, another woman was robbed in Wichita Falls at 8:24 p.m. A few miles away, Wilhelm's car was discovered with that woman's possessions in it. Murphy clocked in for work in Terrell at 11:54 p.m. that same day. Murphy argues his counsel should have submitted evidence that it takes 3 hours and 15 minutes to drive from Wichita Falls to Murphy's job in Terrell (accounting for a detour to accommodate where Wilhelm's car was found). Murphy contends that such evidence would show it was logistically impossible for him to pull off the back-to-back crimes and make it to work on time.

Not so. If Murphy robbed the other woman at 8:24 p.m., he would have had 3 hours and 30 minutes to get to work—15 minutes more than the driving time Murphy now proffers. Thus, the evidence would show the feat would be difficult, but not impossible—especially if Murphy was speeding.

This undercuts Murphy's case on both of *Strickland*'s prongs. His counsel did not perform unreasonably or prejudice Murphy by failing to put on evidence showing that the timeline was technically achievable. She had already presented substantial evidence on the alibi defense. She presented evidence of

the times and locations of the two crimes and Murphy's clock in, the fact that the other woman's description of her assailant did not match Murphy, and the diary of a woman Murphy lived with, which indicated he stayed home during the day and worked regular night shifts. She also attacked Wilhelm's identification—the main evidence linking Murphy to the kidnapping—through cross-examination and with an expert. Using all this evidence, Murphy's trial counsel argued that Murphy could not have committed both offenses and clocked in on time. That Murphy's trial counsel did not present evidence showing the drive was cutting it close but ultimately feasible was not debatably unreasonable or prejudicial.[8]

**2.**

Next, Murphy argues that his trial counsel performed deficiently by failing to correct several impressions left by Dr. Connell's testimony. We address this claim only briefly. *See Busby v. Davis*, 677 F. App'x 884, 893 (5th Cir. 2017) (per curiam) ("At this stage, we simply conclude that reasonable jurists could debate whether [the petitioner] has presented a substantial, or viable, IATC claim sufficient to excuse the procedural default and to merit a COA."). Reasonable jurists could debate whether it was reasonable for counsel not to intervene and whether such intervention had a reasonable probability of causing a different outcome. As this IATC claim is debatable, we also conclude that Murphy's original state habeas counsel was at least debatably ineffective in failing to raise it. Thus, because the district court's merits and

---

[8] Once more, we conclude that the district court did not debatably abuse its discretion in refusing Murphy an evidentiary hearing on this claim. Whether counsel's omission of the travel time evidence was considered or not, the omission was objectively reasonable and non-prejudicial.

procedural grounds for denying this claim are debatable, we grant Murphy a COA on this claim. *See Slack*, 529 U.S. at 484–85.[9]

**3.**

Finally, Murphy argues that his trial counsel should not have called Dr. Crowder. He argues that Dr. Crowder's testimony was duplicative with other mitigation witnesses. Rather than helping his case, Dr. Crowder harmed it by admitting that he would be "concerned" if Murphy were outside prison.

Murphy does not debatably satisfy *Strickland*'s performance prong. Viewed without the benefit of hindsight, calling Dr. Crowder to testify was reasonable. Dr. Crowder is a qualified psychologist who has testified during death penalty cases before. He offered useful and unique mitigation testimony. He could deliver an expert opinion on Murphy's mental composition, the effect of Murphy's rough upbringing, and how Murphy's behavior might change in a controlled environment. The mitigation evidence Dr. Crowder offered was non-duplicative—only Dr. Crowder tied Murphy's childhood abandonment to his behavior and depression.

Further, the low level of harm that Dr. Crowder's testimony caused to Murphy's case is strong evidence that counsel's decision was prospectively reasonable and non-prejudicial. While Dr. Crowder admitted he would be concerned about Murphy outside prison, he mitigated that admission in several ways. He testified that Murphy would not be parole eligible for 40 years, that the general risk of escape is small, and that Murphy did not present a high risk of escaping. Any issues the prosecution pointed out during cross-examination were problems with Murphy's case and not Dr. Crowder's testimony. To the extent that Dr. Crowder's later explanation could not

---

[9] We do not reach at this time the question of whether the district court abused its discretion by refusing to grant an evidentiary hearing on this claim. The parties may address this issue in their next round of briefing.

## No. 17-70007

eliminate the taint of his harmful testimony, that taint was inevitable given the nature of Murphy's case. Thus, reasonable jurists could not debate that Murphy has not satisfied either *Strickland* prong.[10]

### V.

For the foregoing reasons, we GRANT a COA on Murphy's *Brady* claim based on Wilhelm's pretrial conversation with the prosecutor and on Murphy's IATC-penalty claim based on failure to correct potentially false impressions created by Dr. Connell. Murphy shall submit a brief on these claims within 60 days. The State shall submit a response within 30 days thereafter. We DENY a COA on the rest of Murphy's claims.

---

[10] The district court did not debatably abuse its discretion by refusing Murphy an evidentiary hearing on this claim. Whether counsel anticipated the State's questioning of Dr. Crowder or not, calling Dr. Crowder was objectively reasonable and non-prejudicial.